IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
SENIOR JUDGE MARCIA S. KRIEGER

Civil Action No. 18-cv-01792-MSK-KLM

SCOTT G. MARTINEZ,

     Plaintiff,

v.

STARTEK USA, INC.,

     Defendant.

_____

OPINION AND ORDER GRANTING IN PART MOTION FOR SUMMARY
JUDGMENT AND DISMISSING CLAIMS FOR LACK OF SUBJECT-MATTER
JURISDICTION
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's ("Startek") Motion for Summary Judgment, Mr. Martinez's response (**# 72**), and Startek's reply (**# 77**).[1]  Also pending is Startek's Motion To Restrict Access (**# 66**) to certain exhibits attached to its summary judgment motion.

## FACTS

The Court briefly summarizes pertinent facts here, elaborating as necessary in its analysis.  Mr. Martinez, who is of Hispanic origin, was employed by Startek as a Senior Director of Sales, responsible for recruiting customers and selling Startek's services to them.  Mr. Martinez was supervised by the Senior Vice President of Sales, a position that was occupied first by Joe Duryea, and later by Cory White.  Startek's President and Chief Executive Officer was

---

[1]    Mr. Martinez moved (**# 79**) for leave to file a sur-reply in response to Startek's summary judgment reply.  The Court finds that the tendered sur-reply does not meaningfully contribute to the analysis and thus denies Mr. Martinez's motion.

Chad Carlson.  Mr. Martinez resigned his employment with Startek in September 2017, taking a similar job with one of Startek's competitors.

Mr. Martinez's claims in this action touch on several aspects of his employment with Startek.  He alleges that Startek failed to pay him commissions to which he was entitled.  He disputes the validity of an agreement with Startek that he signed in 2013 in which he waived his right to certain commissions.  He also contends that he was paid less than similarly-situated non-Hispanic employees, and that Startek refused to promote or give him the title of Vice President because of his Hispanic national origin.  In addition, he contends that although he advised Startek that a proposed deal with a certain customer was "stalled" and not yet finalized, Startek reported in filings with the Securities and Exchange Commission ("SEC") that the deal was complete, and when he disputed the accuracy of that representation, he was told to complete the deal or he would be terminated.  Mr. Martinez also contends that he was subjected to a hostile working environment based on his Hispanic origin, resulting from the incidents described above and demeaning anti-Hispanic language used by various Startek officials.  Finally, Mr. Martinez contends that his decision to resign from Startek was, in actuality, a constructive discharge by Startek due to the events above.

Mr. Martinez's Complaint (# 1) alleges six[2] causes of action: (i) discrimination on the basis of national origin (Hispanic), in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, based on Startek paying similarly-situated non-Hispanic employees more favorably; (ii) discrimination on the basis of national origin in violation of Title VII and 42 U.S.C. § 1981, based on Startek's failure to promote him to Vice President; (iii)

---

[2]     Mr. Martinez has voluntarily dismissed (# 80) a seventh claim, sounding in breach of contract.

maintenance of a national origin-based hostile working environment, in violation of Title VII and 42 U.S.C. § 1981; (iv) failure to pay wages owed, in violation of C.R.S. § 8-4-101 *et seq.*; (v) retaliation, in violation of Title VII and 42 U.S.C. § 1981, in that Startek constructively discharged him for complaining about national origin discrimination; and (vi) a tort claim for wrongful discharge in violation of public policy, apparently arising under Colorado law, in that Mr. Martinez was constructively discharged for having complained of Startek's false reporting in its SEC filings.

Startek moves (**# 61**) for summary judgment in its favor on each claim.  The Court will not separately summarize the particular arguments raised by Startek, but instead will address them in its analysis.  Separately, Startek moves (**# 66**) for leave to restrict public access to certain exhibits attached to its summary judgment motion, pursuant to D.C. Colo. L. Civ. R. 7.2.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

       If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

       If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Discrimination claims

       Two of Mr. Martinez's claims – wage discrimination and failure to promote – assert that

Startek intentionally took in adverse actions against him because of his Hispanic national origin.

Several of his other claims (*i.e.* those that rely upon his alleged constructive discharge as a

predicate) touch on those same allegations to a significant extent.  Thus, the Court begins with a review of Mr. Martinez's discrimination claims.

Mr. Martinez brings claims under both Title VII and 42 U.S.C. § 1981, but the analysis is the same under each statute.  *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).  To prove his claims, Mr. Martinez bears the burden of first establishing a *prima facie* case of discrimination by showing: (i) that he is a member of a protected class; (ii) that he suffered an adverse employment action; and (iii) that adverse action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.[3]  *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).  If Mr. Martinez carries this burden, Startek is obligated to proffer a legitimate, non-discriminatory reason for the adverse action, and if it does, then Mr. Martinez bears the ultimate burden to demonstrate that Startek's proffered reason is a pretext for discrimination.  *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018).

### 1. Failure to promote

The Court begins with Mr. Martinez's contention that Startek discriminatorily refused to promote him to the title of Vice President.  Startek contends that Mr. Martinez cannot establish that its decision not to promote him occurred in circumstances giving rise to an inference of discrimination.

There is some internal inconsistency in the record as to the process by which an employee would be promoted to the title of Vice President.  Mr. Duryea, Mr. Martinez's

---

[3]      In reducing the *prima facie* case to three elements, the Court omits a commonly-recited fourth element: that the employee was qualified for the position that he or she sought or held. *See e.g. Gaskin v. Science Applications Intl.*, 792 Fed.Appx. 586, 588 (10th Cir. 2019).  To the extent that qualifications are at issue, the Court would consider an argument regarding the employee's lack of qualifications as part of the "inference of discrimination" element.

supervisor, testified that he could recommend such a promotion, but that the decision ultimately belonged to Mr. Carlson.  Mr. Carlson, on the other hand, testified that such a decision was entirely within the realm of a supervisor like Mr. Duryea.  Regardless of this inconsistency, the record reflects that Mr. Duryea did recommend that Mr. Martinez be promoted to Vice President, and that he sought Mr. Carlson's approval.  According to Mr. Duryea, Mr. Carlson responded "that's not going to happen right now, and I don't want to talk about it anymore."  As a result, Mr. Martinez was not promoted.  Although Mr. Carlson denied having a recollection of this event, he gave several reasons why he would not have supported Mr. Martinez for a promotion to Vice President during the period in question.[4]  Some of those reasons relate to the particular changes in the position of Vice President of Sales that Startek was considering, but at least one reason given by Mr. Carlson was specific to Mr. Martinez.  Mr. Carlson testified that he was reluctant to promote Mr. Martinez to a Vice President position at the time because "that was not too far removed from the pretty serious issue we had with Comcast."  This reference requires some explication.

In or about 2013, Mr. Martinez was involved in soliciting certain business from Comcast.  According to Startek,[5] Mr. Martinez represented to Comcast that it would receive certain credits

---

[4]    Not surprisingly, when Mr. Carlson learned that Mr. Martinez planned to defect to a competitor, Mr. Carlson considered offering – and perhaps even offered -- Mr. Martinez a promotion to Vice President in order to persuade him to not leave.

[5]    Mr. Martinez has a slightly different version of this event: he contends that Comcast requested the credits, that Mr. Martinez agreed to convey Comcast's request to his superiors and did so, but that his superiors did not respond promptly, and that Comcast took their lack of response as an agreement to grant the credits.  Although Mr. Martinez does not cite to evidence in the record that corroborates the central distinction between the two versions – that Mr. Martinez was simply a messenger for Comcast's requests, rather than an individual who represented Startek's position on issues of pricing – the distinction is not one that materially affects the analysis.  When the issue to be resolved involves a decisionmaker's alleged animus, the employee's burden is not just to show that the decisionmaker's version of events was factually incorrect, but to show that the decisionmaker did not actually believe the version of

from Startek (or that Startek would waive certain fees) that would help offset some of the contract price, thereby making Startek's proposal more attractive.  Mr. Martinez was required to obtain advance approval from superiors at Startek before offering credits of this type, and although he had sought such approval from Mr. Duryea, he had not received it by the time he made the offer to Comcast.  Comcast agreed to the proposal offered by Mr. Martinez.  When Startek discovered the discrepancy, it concluded that the offer made by Mr. Martinez unacceptably reduced the margin that Startek would earn on the deal, but it agreed to provide the services to Comcast at the price offered by Mr. Martinez.  Nevertheless, Mr. Carlson held Mr. Martinez responsible for the miscommunication.  He met with Mr. Martinez and reached an agreement by which Mr. Martinez agreed to forfeit some portion of his of commission from the Comcast deal[6] as a sort of compensation for the error.

The phrase "circumstances giving rise to an inference of discrimination" is a fairly broad one, but one that does have limits.  Most commonly, an employee will show such circumstances by establishing that the decisionmaker used discriminatory language or actions in other instances, by showing that similarly-situated individuals outside the protected class were treated more favorably,[7] that the decisionmaker's actions were inconsistent with stated policies of the

---

events the employer later posits.  *See e.g. Luster v. Vilsack*, 667 F.3d 1089, 1093-94 (10th Cir. 2011).  Even if Mr. Martinez is correct that he was simply a messenger of Comcast's requests and is not culpable for the confusion over the pricing issue, he has not come forward with any evidence that indicates that <u>Mr. Carlson</u> knew that to be the case and that Mr. Carlson did not believe <u>his own</u> version of events – that Mr. Martinez had made false representations to Comcast about what Startek was willing to do.

[6]    The terms of that agreement are discussed in more detail below.

[7]    Mr. Martinez's response contains a single-sentence assertion that "multiple white individuals were promoted over him," but he cites to no evidence establishing the proposition that these individuals were similarly-situated to him in all pertinent respects.  Thus, the Court declines to consider this undeveloped argument.

employer, or, more generally, based on suspicious timing of the adverse action.  *See generally Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).  Here, Mr. Martinez argues that there is evidence that Mr. Carlson harbored discriminatory animus against Hispanics, but that evidence is weak and equivocal.  Mr. Martinez offers his own testimony, via affidavit, that "Mr. Carlson would repeatedly refer *to others*, *including Hispanic clients*, as untrustworthy."[8]  Putting aside the curious use of the phrase "others, including" in Mr. Martinez's affidavit, the Court notes that Mr. Martinez offers no evidence of anti-Hispanic slurs by Mr. Carlson or any explication Mr. Carlson might have given about the reasons that he didn't trust the individuals in question.  In short, Mr. Martinez attributes anti-Hispanic animus to Mr. Carlson simply because Mr. Carlson stated that he did not trust certain individuals who also happened to be Hispanic.  At most, the evidence suggests a <u>correlation</u>, not a <u>causation</u>; Mr. Martinez has shown that Mr. Carlson did not trust certain people who were Hispanic, but he has not shown that Mr. Carlson did not trust those people <u>because</u> they were Hispanic or that Mr. Carlson did not trust Hispanics as a group.  Indeed, Mr. Martinez' situation is an example of the folly of this line of argument: Mr. Martinez assumes that Mr. Carlson did not trust <u>him</u> because he is Hispanic.  But the record reflects that the reason that Mr. Carlson did not trust Mr. Martinez is because Mr. Carlson believed that Mr. Martinez bungled the negotiations with Comcast in 2013.  Similarly, without further elaboration on <u>why</u> Mr. Carlson might not have trusted the identified Hispanic client representatives, the Court cannot conclude that Mr. Martinez has come forward with anything more than sheer speculation that the reason is <u>because</u> they were Hispanic.

---

[8]     Mr. Martinez offers two examples in which clients lodged high-value contracts with Startek, but Mr. Carlson made comments that he "did not trust" the representatives of those two clients.  One client representative was of Mexican descent and the other was a married couple, both of Bolivian heritage.

Mr. Martinez cites to cases for the ostensible proposition that "the view that Hispanic people are untrustworthy [is] a race-based stereotype." But the cases he relies upon are not factually analogous to the evidence here. For example, in *Ortiz v. School Board of Broward County,* 780 Fed.Appx. 780, 781 (11th Cir. 2019), the decisionmaker "made offensive comments and jokes every day about Puerto Ricans," such as "I'm around too many Puerto Ricans, I better carry my gun with me" and "we need to lock our toolboxes because we're hiring too many Puerto Ricans." Likewise, in *Terminel v. Sky Chefs, Inc.*, 2013 WL 12097462 (D.Ariz. Dec. 12, 2013) (slip op.), the decisionmaker "called [the plaintiff] 'caballero' and 'wetback,' told him that Mexicans were thieves and untrustworthy, and called Mexicans 'stupid' and 'ass holes.'" In both cases, the decisionmaker's comments explicitly coupled the decisionmaker's opinions about trustworthiness with the plaintiff's ethnicity, something Mr. Carlson's comments clearly did not do. If Mr. Martinez had alleged that Mr. Carlson had stated that he did not trust the client representatives (or Mr. Martinez) because they were Hispanic (or that, "Bolivians can't be trusted" or the like), the cases Mr. Martinez cites would be apposite and the outcome here would be different. But the Court cannot say that Mr. Martinez's simple supposition that Mr. Carlson's opinions about an individual's trustworthiness were caused by the individual's ethnicity is sufficient to create a genuine dispute of fact as to Mr. Carlson's discriminatory intent.

Finally, Mr. Martinez points to discriminatory statements made by other officials at Startek, most notably, Brian Gray, a Senior Vice President of Operations. Mr. Martinez alleges that Mr. Gray repeatedly made comments disparaging Hispanics, including disparaging Las Vegas, New Mexico (home of Mr. Martinez's Hispanic wife) as having "mean and brutal women" and an incident in 2017 in Tell City, Indiana, in which Mr. Gray described Mr.

Martinez's hometown of Mora, New Mexico, as being "filled with low riders" and stating that people shouldn't trust Mr. Martinez because he grew up there.

Assuming some animus, however, nothing in the record suggests that Mr. Gray had any input into the decision of whether Mr. Carlson should accept Mr. Duryea's recommendation that Mr. Martinez be promoted to Vice President, nor that Mr. Carlson was aware of (much less condoned) Mr. Gray's discriminatory remarks at the time Mr. Carlson denied Mr. Duryea's recommendation.  Mr. Martinez's suggestion that Mr. Carlson generally had a "tight" relationship with Mr. Gray is simply insufficient to paint Mr. Carlson with any anti-Hispanic animus that Mr. Gray demonstrated.

Accordingly, the Court finds that Mr. Martinez has failed to establish a *prima facie* case of national origin discrimination with regard to his claim of failure to promote, and Startek is entitled to summary judgment on that claim.

2. <u>Wage discrimination</u>

Mr. Martinez alleges that he was paid less than similarly-situated white individuals due to discrimination against him because of his ethnic origin.

The parties dispute with regard to this claim turns on the question of who the appropriate pay comparators are.  Startek contends – apparently without dispute – that Mr. Martinez was paid as much as, if not more than, similarly-situated non-Hispanic individuals with Mr. Martinez's title, Director of Sales.  Mr. Martinez, on the other hand, argues that his pay should be compared to that of persons bearing the title of Vice President.  There is some evidence suggesting that Startek did not have clear lines of demarcation between employees with "Director" titles and employees with "Vice President" titles in the sales department.  Mr. Carlson testified that "there really wasn't that much difference between a Director or a [Vice President] .

. .  There wasn't, you know, tiers or steps really within the overall sales organization."  But Mr. Martinez himself acknowledges that the two titles are not interchangeable, and that "Vice Presidents are generally paid more than Directors."  He also argues that because he was among the top-performing Directors in certain years, "the natural comparators for one of Startek's [ ] highest-performing sales executives are not the lower-paid Directors of Sales, but the higher-paid Vice Presidents."

The Court need not squarely resolve the issue because, even if the Court were to adopt Mr. Martinez's position and include Vice Presidents among the comparators, it would limit that inclusion only to Vice Presidents of Sales.  To serve as similarly-situated comparators, employees must be alike in all meaningful respects – that is, they must perform similar work, report to the same supervisors, and are subject to the same standards governing performance. *See e.g. Richardson v. Gallagher*, 553 Fed.Appx. 816, 824 (10th Cir. 2014).  The record simply fails to establish that persons occupying titles such as Vice President of Financial Planning, Vice President of Strategy & Solutions, or Vice President of Workforce Management, among others, perform similar services as Mr. Martinez and would be expected to earn similar compensation to him.

When pruned to just sales positions, the record reflects the following comparison between Mr. Martinez's total compensation (apparently base salary plus commissions) for the following years and those of persons bearing the title of Vice President of Sales[9] (all of whom are identified as non-Hispanic):

---

[9]     One individual identified as a Director of Sales, Archamendies Rangel, is omitted because his total compensation is listed as "unknown" for all years.

| Name | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| Mr. Martinez | $627,356 | $480,379 | $634,658 | $450,874 |
| Donna Martin | $519,123 | $1,630,967 | $462,099 | n/a |
| Scott Sexton | n/a | n/a | n/a | $389,213 |
| Blayne Shell | $190,076 | $475,372 | $399,330 | $381,361 |

This comparison reveals that, even when compared to persons occupying the title of Vice President of Sales, Mr. Martinez's total compensation exceeded those of all comparators with the exception of a single employee (Donna Martin) in a single year (2015).  In such circumstances, Mr. Martinez has not come forward with evidence demonstrating circumstances giving rise to an inference that he was discriminated against because of his ethnicity with regard to his total compensation.

Mr. Martinez next argues that he was discriminated against because he was not granted stock options, whereas certain white employees occupying both Director of Sales and Vice President of Sales titles were.  The record is somewhat unclear on this point: the sole source of information on this issue is Exhibit HH, Startek's interrogatory response.  Those responses indicate that there were 9 individuals who held the title of Director of Sales during the pertinent time period – all of whom earned less than Mr. Martinez in salary and commissions in all relevant years -- and 4 of whom, all identified as white, were granted stock options.  The record does not reflect any particular measure or value of the options, simply stating that a given individual received, *e.g.* "5,000 in stock options."  Of the three individuals listed above as holding the title of Vice President of Sales, all three are listed as having received stock options,

with Mr. Sexton and Mr. Shell receiving "10,000 in stock options" and Ms. Martin as receiving "30,000 in stock options."  Beyond that, neither side offers any meaningful evidence as to when and why Startek grants stock options to its sales employees, the criteria that are used to determine the amount or value of options that are given, the strike price, or any other information that would permit the Court to make a reasoned analysis.

Without that information, the Court cannot find that Mr. Martinez has come forward with sufficient evidence giving rise to an inference that he was discriminated against because of his race by not being given stock options.  Mr. Martinez has not identified the grounds upon which Startek granted options to sales employees, making it impossible to determine whether Mr. Martinez was similarly-eligible for the options that others received.  It may be that options were granted in lieu of other compensation, such as a lower base salary or commission percentage.  It may be that options were granted to sales employees who generated work from new clients as compared to existing clients, or vice-versa, or as a bonus to employees who worked on specific deals.  It may be that options were granted to induce wayward employees to stay, or to motivate specific employees to meet specific sales targets for specific reasons.  It may be that options are distributed randomly, or as prizes.  Ultimately, it is Mr. Martinez's burden to offer some explanation of Startek's options scheme, and to show that he met the same criteria as those who were granted options, in order to show that he is similarly-situated to the individuals who received them.  Because he has failed to offer any such explanation, the Court is compelled to conclude that he has not demonstrated that his failure to receive any options arose in circumstances giving rise to an inference of ethnic discrimination.

Finally, Mr. Martinez argues that his base salary was lower than that of similarly-situated white Vice Presidents.[10]  Once again, this claim must be limited to Vice Presidents of Sales.  It is true that each of the three Vice Presidents of Sales listed above earned a higher base salary than Mr. Martinez – roughly $180,000 to $190,000 compared to Mr. Martinez's $150,000.  But once again, the absence of any further explanation of how base salaries are set undermines Mr. Martinez's ability to demonstrate that the salary disparity implies ethnic discrimination.  It may be that salaries are individually-negotiated, or it may be that they are set based on the employee's salary at a prior employer or based on the employee's possession of certain skills or qualifications.  But Mr. Martinez offers no insight into how his or any other base salary was established.  Moreover, in this regard, Mr. Martinez is also forced to reckon with his own concession: he was only a Director of Sales, and that Vice Presidents of Sales earned higher compensation than Directors did.  In this circumstance, title alone is a factor that diminishes, rather than enhances, Mr. Martinez's ability to demonstrate an inference that any difference in base salary between him and Vice Presidents was due to his ethnicity.

Accordingly, the Court finds that Mr. Martinez has not come forward with evidence that demonstrates a *prima facie* case of pay discrimination, and Startek is entitled to summary judgment on this claim.

### C.  Retaliation Claim

Next, the Court turns to Mr. Martinez's contention that he was retaliated against for having complained of ethnic discrimination.  Once again, Mr. Martinez asserts this claim under both Title VII and 42 U.S.C. § 1981, but as set forth above, the analysis under both statutes is

---

[10]      Mr. Martinez's base salary matched, if not exceeded, the base salaries of all other Directors of Sales.

identical.  Mr. Martinez must first establish a *prima facie* case of retaliation by showing: (i) that he engaged in the protected activity of opposing discrimination in the workplace; (ii) that he suffered an adverse employment action; and (iii) that the adverse employment action is causally-connected to his protected activity.  If Mr. Martinez carries this burden, then Startek is obligated to articulate a legitimate, non-retaliatory reason for his termination, and Mr. Martinez bears the ultimate burden of proving that Startek's proffered reason is a pretext for retaliation.  *Brown v. Keystone Learning Servs.*, 804 Fed.Appx. 873, 881 (10th Cir. 2020).  To engage in "protected activity" redressable through a retaliation claim brought under Title VII, an employee must engage in opposition to "a practice made unlawful by Title VII" – in other words, discrimination on the basis of sex, race, religion, or ethnicity.  *Brown*, 804 Fed.Appx. at 881; 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against an employee who "has opposed any practice made an unlawful employment practice <u>by this subchapter</u>") (emphasis added).  The fact that Mr. Martinez may have opposed some other form of illegal action or misconduct by Startek does not give rise to a claim of retaliation under Title VII or 42 U.S.C. § 1981.

Mr. Martinez appears to have engaged in a single instance of conduct in which he informed superiors of concerns about ethnic discrimination; after Mr. Gray made the offensive "low rider" remarks at the Tell City meeting in May 2017, Mr. Martinez reported that incident to his supervisor, Mr. White.  It appears to be undisputed that Mr. White did not report that incident up the chain until August 25, 2017.  In the interim, Mr. Martinez considered leaving Startek and asked a recruiter to forward his resume on to one of Startek's competitors.  On September 12, 2017, Mr. Martinez formally informed Startek that he was resigning his employment with Startek.

Mr. Martinez's complaint about Mr. Gray's comments during the Tell City incident constitute protected activity under Title VII, thus establishing the first element of a *prima facie* case of retaliation.  But Mr. Martinez fails to present evidence sufficient to establish the remaining two elements.  First, the record does not reflect that Mr. Martinez suffered any adverse employment action.  Mr. Martinez argues that the Court should construe his resignation in September 2017 as an involuntary "constructive discharge."  A constructive discharge occurs when an employee experiences discriminatory conduct in the workplace that is so intolerable that a reasonable employee would have felt compelled to resign.  *Green v. Brennan*, 136 S.Ct. 1769, 1776-77 (2016).  If the employee demonstrates that the workplace conditions rose to that level, the Court will treat the employee's voluntary resignation from employment as the equivalent of an involuntary termination for purposes of determining whether the employee suffered an adverse action.

Mr. Martinez's invocation of the constructive discharge doctrine is flawed for two reasons.  First, he argues at length that the precipitating event – the "straw that broke the camel's back," as it were – was "Startek's false SEC report and its threat to terminate [Mr.] Martinez if he did not close the deal that Startek falsely reported as closed."  This reference also requires some context.  According to Mr. Martinez's deposition testimony, in or about May 2017, Mr. Martinez was asked by Peter Martino, Startek's Vice President of Global Operations, whether Mr. Martinez had closed an anticipated deal with Sirius XM.  Mr. Martinez responded that he had not and that "we're a long way from getting it closed."  Mr. Martino responded that "we [already] booked it.  And so if . . . you don't close it, we're going to blame you."  Mr. Martinez perceived Mr. Martino's response as a joke (he testified that he responded "not funny; not funny at all"), and he later discussed the issue with Mr. White who agreed that Mr. Martino was

probably "kidding."  Later, another employee reported to Mr. Martinez that "Mr. Martino was trying to find a way to blame you for the errant booking of SiriusXM," and that "he" – whether this is Mr. Martino or the employee speaking is unclear – "said I can only . . . suggest you to be very cautious."  The record does not reflect what "booked" means in this context, but the thrust of Mr. Martinez's argument is that Startek reported to the SEC that it had closed the deal with SiriusXM when, in fact, the deal had not closed.  Mr. Martinez's affidavit gives a slightly different version of this event.  It appears to suggest that Mr. Martino "threatened me that I had better close the deal 'or else.'"  Although Mr. Martinez's response brief argues that he was threatened with termination if he did not close the SiriusXM deal, nothing in the record appears to indicate that Mr. Martinez was expressly threatened with termination, only that he was told that he would be "blamed" or that an unspecified "else" would occur.

Mr. Martino's "threats" against Mr. Martinez are not a form of discrimination prohibited by Title VII.  To constitute a constructive discharge for purposes of a Title VII claim, the conduct prompting the employee's resignation must be conduct that is itself discriminatory or retaliatory under Title VII.  *See generally Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998) ("Constructive discharge occurs when the employer <u>by its illegal discriminatory acts</u> has made working conditions so difficult . . .") (emphasis added).  But Mr. Martinez cannot argue that Mr. Martino's threat to force Mr. Martino to complete the SiriusXM deal (and rectify any SEC reporting that may have occurred) is a form of discrimination or retaliation that implicates any of Title VII's prohibitions.  On its face, the threat and circumstances surrounding it have nothing whatsoever to do with alleged discrimination or retaliation on the basis of race, ethnicity, or any other protected class under Title VII.  At most, even in Mr. Martinez's conception, the threat relates to Startek's reporting requirements with the SEC.  Nor can Mr.

Martinez link Mr. Martino's threat to Mr. Martinez's complaint to Mr. White about the Tell City incident, as it appears to be undisputed that Mr. White had not yet told any other Startek official, including Mr. Martino, about Mr. Martinez's allegations.  Mr. Martinez's deposition testimony posits that "Mr. Martino and Mr. Gray are extremely close[, s]o clearly, [Mr. Martino's threats] was a bit of a retaliation on my reporting of Mr. Gray."  But Mr. Martinez points to no evidence that Mr. White ever communicated Mr. Martinez's complaint to Mr. Martino prior to the SiriusXM incident. Indeed, Mr. Martinez testified that Mr. White did not take his complaint seriously and suggested that, even if Mr. Martinez repeated that complaint to the Human Resources Department, no action would likely be taken.  Without evidence that Mr. Martino was aware of Mr. Martinez's complaint, Mr. Martino's actions towards Mr. Martinez cannot constitute retaliation.  *Keeler v. ARAMARK*, 536 Fed.Appx. 771, 773 (10th Cir. 2013). Thus, Mr. Martino's threats cannot constitute or contribute to a constructive discharge for Title VII purposes.[11]

In any event, Mr. Martinez's allegations, taken together, fail to rise to the level of a constructive discharge.  To demonstrate a constructive discharge, Mr. Martinez must point to discriminatory conduct by Startek that was so intolerable that he "ha[d] no other choice but to quit."  *Sampson v. Kane Is Able, Inc.*, ___ Fed.Appx. ___, 2020 WL 2078280 (10th Cir. Apr. 30, 2020).  In other words, the degree of discrimination in the workplace must be such that Startek

---

[11]     Moreover, even assuming – contrary to the record – that Mr. Martino expressly threatened Mr. Martinez with termination as a result of the SiriusXM incident, such a threat would not constitute a constructive discharge in any event.  Even "requiring an employee to choose between resignation and termination is not necessarily a constructive discharge, unless the employee's decision is, for some reason, involuntary."  *Sotunde*, 716 Fed.Appx. at 768. Here, to the extent Mr. Martino gave Mr. Martinez a choice – to resign from Startek or to be terminated for the SiriusXM incident, Mr. Martinez clearly made a voluntary choice to choose resignation over termination.

"did not allow [Mr. Martinez] the opportunity to make a free choice regarding his employment relationship." *Sotunde v. Safeway, Inc.*, 716 Fed.Appx. 758, 768 (10th Cir. 2017).  The standard is an objective one, ignoring the employee's own subjective views of the workplace and the employer's subjective intentions. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005)  Here, the list of discriminatory conduct that Mr. Martinez experienced at Startek begins and ends with the ethnically-harassing comments of Mr. Gray at a single meeting in May 2017.  Mr. Martinez argues that additional instances of conduct – Mr. Carlson refusing to promote him to Vice President and blaming him for the Comcast incident, Startek paying him less than other employees, and withholding certain commissions ostensibly pursuant to an agreement Mr. Martinez signed after the Comcast incident – contribute to the constructive discharge analysis, but the Court finds that, for the reasons discussed above, Mr. Martinez has failed to come forward with evidence suggesting that those events were in any way discriminatory.[12]  Taken together, these events would not suffice to rise to the level of a constructive discharge. *Compare Sotunde*, 716 Fed.Appx. at 768 (failure to promote employee, his supervisor discrediting his work, and management spreading rumors that he "would not be there much longer" did not amount to a constructive discharge).

Accordingly, because Mr. Martinez cannot demonstrate a triable issue of fact as to whether his resignation was actually a constructive discharge, he has not come forward with any evidence that indicates that he suffered an adverse employment action after having complained to Mr. White in May 2017 about Mr. Gray's comments in Tell City.  Accordingly, Mr. Martinez

---

[12]     The Court has not previously discussed the withholding of commissions, but at most, Mr. Martinez has come forward with evidence that there was some confusion over the proper application of an agreement that Mr. Martinez had signed that waived certain commissions.  Mr. Martinez has pointed to nothing that suggests that this issue was in any way discriminatory.

cannot establish a *prima facie* case of retaliation and Startek is entitled to judgment in its favor on that claim.

### D. Hostile Environment Claim

Finally, the Court turns to Mr. Martinez's contention that he was required to work in an ethnically-hostile working environment. To establish a claim of a hostile working environment, Martinez must show, among other things, that he was subjected to instances of discrimination or ridicule premised upon his ethnicity, and that those instances were so severe and pervasive that they amounted to an alteration of the terms and conditions of his employment. *See e.g. Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005). In considering whether the conduct alleged was sufficiently severe or pervasive, the Court considers factors such as the frequency of the conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id.*

Here, for many of the same reasons discussed with regard to Mr. Martinez's allegations of constructive discharge, the Court finds that Mr. Martinez has failed to demonstrate a genuine issue of fact as to whether he was exposed to a sufficiently hostile work environment. Mr. Martinez has identified a single incident[13] in which Mr. Gray, an executive of Startek, but not one who supervised or directed Mr. Martinez, made ethnically-offensive remarks. Those remarks, although certainly bigoted and inappropriate, were neither especially hostile nor

---

[13] Mr. Martinez's deposition testimony seems to suggest that Mr. Gray's comments about "mean women" in New Mexico occurred at a different meeting in or about July 2016, and that Mr. Gray may have made similar comments on several occasions to Mr. Martinez in Mr. Martinez's office. Even adjusting the analysis to account for these more frequent remarks, Mr. Gray's cryptic remarks about "mean women" from New Mexico is only loosely connected to Hispanic ethnicity, and thus, while such comments may be more pervasive Mr. Gray's "low rider" comment, they are somewhat less severe. Thus, clarification of when various remarks were made does not materially alter the Court's analysis.

threatening to Mr. Martinez.  Thus, they were neither particularly severe nor especially

pervasive.  Although Mr. Martinez was certainly offended by those remarks, they do not appear

to have affected Mr. Martinez's work performance (except perhaps to the extent that they

induced Mr. Martinez to begin looking for work elsewhere).  The remaining components of Mr.

Martinez's claimed hostile environment are comments or actions discussed above (*e.g.* Mr.

Carlson deeming Mr. Martinez and others "untrustworthy"; Mr. Carlson refusing to promote Mr.

Martinez) for which Mr. Martinez has not come forward with any evidence that such comments

or actions occurred <u>because of</u> his ethnicity.  *Chavez*, 397 F.3d at 833.  Accordingly, the Court

finds that Mr. Martinez has failed to demonstrate a genuine dispute of fact as to whether he was

subjected to a hostile work environment and Startek is entitled to summary judgment on that

claim.

### E.  Remaining claims

Mr. Martinez's remaining claims – violation of a Colorado statute governing payment of

wages and a tort claim, apparently under Colorado law, for wrongful discharge – arise under

state law.  28 U.S.C. § 1367 allows the Court to exercise supplemental jurisdiction over state-law

claims when those claims are coupled with claims over which the Court has original jurisdiction.

However, because the Court enters judgment in favor of Startek on all of Mr. Martinez's Title

VII and 42 U.S.C. § 1981 claims, there are no longer any claims over which this Court has

original jurisdiction.  In such circumstances, the Court may – and indeed should – decline to

exercise supplemental jurisdiction over the remaining state-law claims.  28 U.S.C. § 1367(c);

*Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998).   Accordingly, the Court dismisses

Mr. Martinez's state-law claims for lack of subject-matter jurisdiction.

### F.  Motion for Leave to Restrict

Startek's Motion for Leave to Restrict seeks to restrict public access to certain exhibits attached to its summary judgment motion, specifically Exhibits G, P, Q, and R.[14]  Startek argues that these documents were produced by Mr. Martinez's new employer, and that such documents were marked "Confidential" pursuant to the parties' agreed Protective Order.  Startek also makes a perfunctory argument that "the documents include sensitive, confidential, and personal information."

The Court need not extensively discuss the operation of D.C. Colo. L. Civ. R. 7.2, nor the various reasons why Startek's motion fails to make the showings required by subsections (c)(2)-(4) of that Rule.  Ultimately, the four exhibits in question address matters that this Court was not required to consider for purposes of this Order, and the public has only a minimal interest in materials that were submitted to, but not considered by, the Court.  *Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 755 (10th Cir. 2009).  Because there is no material public interest in access to the documents, the Court denies Startek's motion as moot, but will allow the documents to remain under restriction.

### <u>CONCLUSION</u>

For the foregoing reasons, Startek's Motion for Summary Judgment **(# 61)** is **GRANTED IN PART**.  Startek is entitled to judgment in its favor on Mr. Martinez's claims for pay discrimination, failure to promote, hostile work environment, and retaliation under Title VII and 42 U.S.C. § 1981, and the Clerk of the Court shall enter such judgment in Startek's favor.

---

[14]     For purposes of identification, Exhibit G consists of Mr. Martinez's W-2 earnings statements from 2014 through 2017.  Exhibit P consists of Mr. Martinez's employment application submitted to Startek's competitor in 2017.  Exhibit Q is the competitor's offer letter to Mr. Martinez dated August 9, 2017.  Exhibit R is Mr. Martinez's signature acknowledging receipt of the competitor's employee handbook as of September11, 2017.

Mr. Martinez's remaining claims – for violation of C.R.S. § 8-4-101 and for wrongful discharge, are **DISMISSED** for lack of federal subject-matter jurisdiction.  Startek's Motion to Restrict Access **(# 66)** is **DENIED AS MOOT**, but the filings at Docket #62 shall remain under provision restriction.  Mr. Martinez's Motion for Leave to File a Sur-Reply **(# 79)** is **DENIED**. Upon entry of judgment in favor of Startek as to the claims specified, the Clerk of the Court shall close this case.

Dated this 2nd day of August, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge